IN THE MATTER OF: J.R., I.R., and D.R., Minor Children
No. COA09-449
Court of Appeals of North Carolina.
Filed August 18, 2009
This case not for publication
Jamie L. Hamlett, for Alamance County Department of Social Services, petitioner-appellee.
Pamela Newell Williams, for Guardian ad Litem.
Carol Ann Bauer, for respondent-appellant mother.
Lucas & Ellis, PLLC, by Anna S. Lucas, for respondent-appellant father.
JACKSON, Judge.
Michelle R. ("respondent-mother") and Jeffrey R. ("respondent-father") (collectively, "respondents") appeal from the trial court's order terminating their parental rights as parents of the minor children, D.R., born in 1995, I.R., born in 1997, and J.R., born in 1998. After careful review, we affirm.
The following facts are undisputed by respondents. Respondents are a married couple who also are licensed foster care parents. They have provided care for dozens of children over the years. Respondents' family consists of eleven children: respondent-mother has two adult children, including Matthew Paul Strickler ("Strickler"); respondent-father has two adult children; respondents have one biological child together, seventeen-year-old A.F.; and respondents have adopted six children ranging in ages from ten to eighteen years old, including J.R., I.R., and D.R., the minor children who are the subject of this appeal.
On 12 October 2006, the Alamance County Department of Social Services ("DSS") took the children into custody pursuant to a non-secure custody order. On 13 October 2006, DSS filed juvenile petitions alleging abuse, neglect, and dependency. The petitions alleged that the mental health needs of the children were not being met, thereby creating an environment injurious to their welfare. Upon investigating the lack of medical or remedial care, several of the children made disclosures regarding sexual abuse by Strickler and A.F. When the children attempted to disclose this information to respondents, respondents punished the children and took no steps to prevent further acts of abuse.
The adjudication hearing was held between 5 March 2007 and 9 March 2007. D.R., I.R., and J.R. were adjudicated neglected along with a fourth child. Two other siblings, not the subject of this appeal, were adjudicated abused and neglected. The following facts found at the adjudication hearing also were incorporated into the trial court's order terminating respondents' parental rights: that inappropriate touching occurred between A.F. and two other siblings, Strickler engaged in oral and anal sex with one sibling and sexual intercourse with another sibling, and when the children attempted to tell respondents, they were called liars and punished. A.F. admitted to investigators that he had touched D.R. inappropriately, and that he engaged in simulated sexual intercourse with one of the other children. Respondents engaged in inappropriate physical discipline of the children, sometimes resulting in bruising or bleeding, and respondent-mother used derogatory names for the children in front of them. The trial court allowed respondents to have visitation with I.R. and J.R., but not with D.R., and ordered respondents to comply with an out-of-home family services agreement.
In addition to other requirements, respondents were to (1) cooperate with the completion of a sex offender evaluation for A.F. and follow the recommendations, (2) develop a safety plan in order for A.F. to have no access to the children, (3) take part in the children's therapy, (4) provide financial support to DSS for the care of the children, (5) maintain appropriate housing and employment, (6) adhere to the visitation plan, (7) have no other children in the home while working on their issues, (8) cooperate with DSS, and (9) obtain parenting evaluations. The trial court entered its order from the adjudication hearing on 21 May 2007.
The requirements placed on respondents were reiterated in substantial form at subsequent review hearings held on 15 August 2007, 28 November 2007, and 27 February 2008. The concurrent permanent plans for D.R., I.R., and J.R. throughout the review period was reunification and adoption.
On 19 May 2008, DSS filed a motion for termination of parental rights and alleged as grounds for termination for both respondents: (1) abuse or neglect of the children as set forth in North Carolina General Statutes, section 7B-1111(a)(1); (2) willfully leaving the children in foster care for more than twelve months without showing to the satisfaction of the court that reasonable progress under the circumstances has been made to correct the conditions which led to the removal of the children as set forth in North Carolina General Statutes, section 7B-1111(a)(2); and (3) willfully failing to pay a reasonable portion of the cost of care for the juveniles for a continuous period of six months preceding the filing of the motion as set forth in North Carolina General Statutes, section 7B-1111(a)(3).
The matter came on for hearing from 8 September 2008 through 11 September 2008, on 15 October 2008, and on 22 October 2008. Respondents did not testify at the hearing. After hearing all the evidence, the trial court concluded that grounds existed to terminate respondents' parental rights as to the minor children based upon abuse or neglect, and upon the basis that they willfully left the children in foster care for more than twelve months without making reasonable progress to correct the conditions which led to the removal of the children from the home. The trial court also determined that termination of respondents' parental rights is in the best interests of the children and ordered that parental rights be terminated. From the order entered, respondents appeal.
As a preliminary matter, we note that appellee guardian ad litem has filed a motion to dismiss respondent-mother's appeal upon the basis that respondent-mother failed to file a proper notice of appeal signed by both herself and her attorney as required by North Carolina Rules of Appellate Procedure, Rule 3A(a). See N.C. R. App. P. 3A(a) (2007). A notice of appeal signed by respondent-mother, but not her attorney, was filed on 23 December 2008 from the court's 24 November 2008 order terminating parental rights. Respondent-mother has not moved to amend the notice of appeal or file a corrected notice of appeal. On 22 April 2009, the guardian ad litem filed a motion to dismiss for failure to timely file a proper notice of appeal. This motion is granted.
However, on 28 April 2009, respondent-mother filed a petition for writ of certiorari to review the merits of the appeal notwithstanding the faulty notice of appeal. She states that she was unable to contact her attorney because he was on vacation for the holiday, and that she had to file the notice of appeal without her attorney's signature in order to meet the deadline. Although respondent-mother failed to file a corrected notice of appeal, (1) her filing notice of appeal indicates her desire to pursue an appeal, (2) neither the guardian ad litem nor DSS has filed a response to the petition for writ of certiorari, and (3) all issues have been fully briefed. Therefore, although we grant the motion to dismiss respondent-mother's appeal, we elect to exercise our discretion pursuant to Rule 21 of the Rules of Appellate Procedure, and allow respondent-mother's petition for writ of certiorari to review her arguments on appeal. N.C. R. App. P. 21 (2007).
Respondent-father challenges the trial court's order on the basis that the court's findings and conclusions terminating his rights for neglect and failure to make reasonable progress are not supported by competent evidence. He contends that he completed all of the tasks asked of him, and that his failure to admit to any allegations of misconduct by A.F. against the other children was due to not wanting to criminally implicate himself or A.F. before the resolution of criminal proceedings. He states that failure to admit wrongdoing is not a sufficient basis upon which to terminate his parental rights. Furthermore, both respondents contend that the trial court abused its discretion in terminating their parental rights because they assert that termination is not in the best interests of the children. We disagree.
Termination of parental rights cases involve two separate components. In re Blackburn, 142 N.C. App. 607, 610, 543 S.E.2d 906, 908 (2001). In the adjudicatory stage, the burden is on the petitioner to prove that at least one ground for termination exists by clear, cogent, and convincing evidence. N.C. Gen. Stat. § 7B-1109 (2007); In re Blackburn, 142 N.C. App. at 610, 543 S.E.2d at 908. Review in the appellate courts is limited to determining whether clear, cogent, and convincing evidence exists to support the findings of fact, and whether the findings of fact support the conclusions of law. In re Huff, 140 N.C. App. 288, 291, 536 S.E.2d 838, 840 (2000), appeal dismissed and disc. rev. denied, 353 N.C. 374, 547 S.E.2d 9 (2001). Once the trial court has determined that a ground for termination exists, the court moves on to the disposition stage when it must determine whether termination is in the best interests of the child. N.C. Gen. Stat. § 7B-1110(a) (2007). The decision of the trial court regarding best interests is within the discretion of the trial court and will not be overturned absent an abuse of discretion. In re Anderson, 151 N.C. App. 94, 98, 564 S.E.2d 599, 602 (2002). Abuse of discretion occurs when the trial court's challenged actions are "manifestly unsupported by reason." In re R.B.B., 187 N.C. App. 639, 648, 654 S.E.2d 514, 521 (2007) (citation and internal quotation marks omitted), disc. rev. denied, 362 N.C. 235, 659 S.E.2d 738 (2008) .
A trial court may terminate parental rights upon a finding that a parent has neglected the minor child. N.C. Gen. Stat. § 7B-1111(a)(1) (2007). A child is neglected if he or she is one
who does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker; or who has been abandoned; or who is not provided necessary medical care; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare; or who has been placed for care or adoption in violation of law.
N.C. Gen. Stat. § 7B-101(15) (2007). In determining neglect, the court must consider "the fitness of the parent to care for the child at the time of the termination proceeding." In re Ballard, 311 N.C. 708, 715, 319 S.E.2d 227, 232 (1984) (emphasis in original). Although evidence of past neglect is admissible, "[t]he trial court must also consider any evidence of changed conditions in light of the evidence of prior neglect and the probability of a repetition of neglect." Id. This is especially true where the parent has not had custody of the child for quite some time. Id. at 714, 319 S.E.2d at 23132.
Initially, we note that respondents do not challenge the trial court's findings of fact on appeal. "Where no exception is taken to a finding of fact by the trial court, the finding is presumed to be supported by competent evidence and is binding on appeal." Koufman v. Koufman, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991) (citations omitted). See also In re Humphrey, 156 N.C. App. 533, 540, 577 S.E.2d 421, 426 (2003) ("Findings of fact to which a respondent did not object are conclusive on appeal.") (citing In re Wilkerson, 57 N.C. App. 63, 65, 291 S.E.2d 182, 183 (1982)).
Although the prior adjudication in this case established the existence of past neglect, DSS had the burden to show either that neglect existed at the time of the termination hearing, or that a reasonable probability existed that neglect likely would be repeated if the children were returned to respondents' care. Here, the trial court made numerous findings of fact which tend to support the ground of neglect. The trial court made the following relevant findings of fact:
41. On July 17, 2007, Helen T. Brantley, Ph.D. submitted a parental competency and psychological evaluation for [respondents] to [DSS].
. . . .
45. [Respondents] appear incapable of providing for the safety of the children because of [their] persistent, global denial that any abuse or neglect occurred in their household and [respondent-mother's] assertion that she had taken all necessary precautions to prevent any inappropriate sexual activity among their adopted children.
46. Without [respondents'] acknowledgement that the children were abused, profound issues of trust will persist between the children and their adoptive parents. Without the [respondents'] acknowledging specifically what happened to each child, reunification efforts would further exacerbate the trust issues between the adopted children and the [respondents].
47. The lack of trust between children and caretakers can be significant. The children may learn they cannot trust their caretakers and may be unable to report abuse incidents, which increases the risk of future abuse and/or neglect. It also contributes to negative psychology pathology.
48. The [respondents] would need to be able to acknowledge the abuse and neglect that occurred in their home before there could be any possibility of reunification.
49. Both parents lack insight into the needs of the children, particularly [respondent-father].
50. Although the [respondents] are nurturing, they demonstrate no empathy for the children.
51. The [respondents] have a limited superficial understanding of the needs of their children. They provided affection, but they clearly were unable to address the children's emotional needs; for example, they discontinued the children's therapy against [the] therapist's recommendation.
52. The [respondents] have little understanding of the specific needs of adopted children. They terminated the children's contact with prior foster parents and stated all the children wanted was a permanent family, thus disregarding their need to acknowledge and have contact with previous attachment and parenting figures.
53. The [respondents] continued to bring children into their home beyond their capacity to provide for those children, especially the heightened needs of the type of children they brought into their home. This demonstrates that what probably began as an honorable mission to help children but evolved into a self-serving need to meet their own psychological needs and/or, possibly, monetary need.
54. The [respondents] minimized the children's needs and maintained, with the exception of [A.F.], that none of the children had any specific behavioral problems. In order for the parents to be able to meet the needs of the children, they must first recognize the problems exist.
55. The [respondents] did not retain or implement much of what they were taught as foster parents. The [respondents] seem resistant to intervention and it is unlikely they would implement tools and strategies suggested by others.
56. The [respondents] are faced with an almost untenable choice between their biological son and their adopted children.
57. The [respondents] continue to deny any wrongdoing and will never be able to parent with denial.
58. The [respondents] understand reality and comprehend what is happening but they feel persecuted.
59. In the fourteen months since the psychological evaluation was completed, the [respondents] have not adequately sought services or addressed issues raised. Their lack of efforts supports the conclusions of the evaluation.
60. The [respondents] should have been more familiar with the psychological needs of their children. They are intellectually capable but did not follow through.
61. In April of 2007, Rebecca Royal with the Exchange Club Child Abuse Prevention Center of North Carolina performed a Juvenile Sexual Offender Specific Evaluation for [A.F.].
. . . .
65. [Respondents] and [A.F.] denied any inappropriate sexual activity and articulated their beliefs in why the various different children would have made statements of being mistreated.
66. [Respondent-mother] reported that she and her husband [] still love all the children but it is wrong to make up things that aren't true, resulting in relational changes within the family.
. . . .
72. [A.F.] lacks empathy for his victims and denies any inappropriate behavior which causes heightened concern for his risk of reoffending. He has no remorse.
. . . .
76. On August 28, 2007, [DSS] had a Child and Family Team meeting with [respondents]. Social Worker Linens provided [respondents] with a copy of the proposed safety plan developed by [DSS] and requested that [respondents] get back with him by Friday, September 7, 2007.
. . . .
78. On September 7, 2007, Social Worker Linens did not hear from [respondents] regarding the safety plan. This is despite the March 2007 order which required [respondents] to follow the recommendations of the sex offender evaluation and the August 15, 2007 order which required [respondents] to develop a safety plan.
. . . . 87. [DSS] still has not received a finalized safety plan from [respondents].
. . . .
94. [Respondents] did not enroll [A.F.] in sex offender treatment therapy until late spring of 2008 and have not sought the treatment recommended for themselves in the sex offender evaluation.
95. [Respondents] did not seek treatment for [A.F.] in a timely fashion.
. . . .
101. [Respondents'] continual denial causes additional trauma for the children and would cause risk to the children if the children were returned to their primary care.
102. The [respondents] have refused to comply with even the simplest orders of the Court without being told several times. . . .
103. [Respondents], but particularly [respondent-mother], were evasive in working with [DSS].
104. It often took court orders to get the [respondents] to follow through because of their resistance.
105. This could be a psychological indication that the [respondents] do not truly want their children returned to their home.
106. The [respondents] did not adequately seek therapy for themselves. [Respondent-mother] did not seek therapy at all and [respondent-father] made only a perfunctory effort.
. . . .
113. The [respondents] have lived at approximately four different addresses during the time that [DSS] has worked with them.
114. The [respondents] have not timely told the social workers where they were residing and have, at times, withheld information about their residence.
115. Social workers have not been able to conduct home visits which are necessary to determine the living situation and evaluate if the [respondents] have an appropriate home for the children, including a sufficient safety plan for [A.F.].
. . . .
122. Social workers have had difficulty contacting the [respondents].
123. The [respondents] have not followed through with the items requested of them by the Court or [DSS].
124. The [respondents] have not complied with the recommendations of the parental competency and psychological evaluation.
125. The [respondents] have not complied with the recommendations of the sex offender evaluation.
126. There is a risk of repetition of abuse and neglect of the children if they are returned to the [respondents] because the [respondents] have not made sufficient progress.
127. The [respondents] have the ability to have made reasonable progress under the circumstances.
128. Their inaction is an indication of ongoing neglect.
As noted above, respondents did not assign error to any of these specific findings of fact; therefore, they are binding on appeal. Koufman, 330 N.C. at 97, 408 S.E.2d at 731.
We conclude these findings of fact are more than sufficient to establish that the children are neglected by respondents, that the neglect continued at the time of the termination hearing, and that such neglect likely would be repeated in the future if the children were returned to respondents. The children were removed from the home and placed in DSS custody due to lack of proper care and supervision, and it subsequently was discovered that sexual acts had been perpetrated upon some of the children by older children in the home. Respondents failed to sign a safety plan for A.F. and follow through with recommendations from the sex offender evaluation; they continue to deny that any wrongdoing took place in the home; they do not seem capable of admitting that any of the children were abused; and these issues led to problems of trust and safety in the home. Respondent-father's argument that his failure to sign a safety plan was due to not wanting to criminally implicate A.F. is inapposite. The findings reflect that he failed to meet many of the requirements of the services agreement, his compliance with court orders and cooperation with DSS was reluctant and sporadic, and his failure to understand the needs of the children all support a finding of neglect.
While many of the findings listed above also may support a finding of failure to make reasonable progress pursuant to North Carolina General Statutes, section 7B-1111(a)(2), only one ground is necessary to support termination of parental rights. See In re Huff, 140 N.C. App. at 290, 536 S.E.2d at 840. Because we hold that the trial court's findings support its conclusion that the children were neglected, we need not delve any further into the ground of failure to make reasonable progress. Respondent-father's assignments of error are overruled.
Next, respondents challenge the trial court's determination that termination of their parental rights is in the best interests of the children. Respondent-father argues that evidence presented shows that the children lived in the home for several years and that they were extremely bonded with respondents, and that their home was a warm, loving environment. He points out that no evidence was presented as to the likelihood of adoption for the two older children, and at the time of the hearing, DSS did not have any prospective adoptive families for the children. Therefore, based upon the statutory factors, respondent-father contends the trial court abused its discretion in terminating respondents' parental rights. Respondent-mother merely reiterates in her brief that the trial court abused its discretion in terminating her rights, and asserts that the children's best interests would be served by being back in her home in familiar surroundings. We are not persuaded by respondents' arguments.
A determination by the trial court that termination is in the best interests of the children is reviewed for an abuse of discretion. In re Anderson, 151 N.C. App. at 98, 564 S.E.2d at 602. The determination of whether termination is in the best interests of the minor child is governed by North Carolina General Statutes, section 7B-1110, which states that the trial court shall consider the following factors:
(1) The age of the juvenile.
(2) The likelihood of adoption of the juvenile.
(3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
(4) The bond between the juvenile and the parent.
(5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.
(6) Any relevant consideration.
N.C. Gen. Stat. § 7B-1110(a) (2007). Findings of fact not challenged are deemed supported by competent evidence and are binding on appeal. Koufman, 330 N.C. at 97, 408 S.E.2d at 731. As noted supra, respondents did not challenge any specific findings of fact; therefore, they are deemed binding on appeal.
With regard to a determination of the best interests of the children, the trial court found as fact:
151. The Court has considered all the issues raised by G.S. 7B-1110, including but not limited to the age of the juveniles, the likelihood of adoption, whether termination will aid in the permanent plan, bond between the juveniles and the parents, bond between the juveniles and current caretakers, and ability of the juveniles to bond with future caretakers.
. . . .
157. The juveniles attend therapy twice a month with Kim Ragland.
. . . .
162. All three children report to the therapist being mistreated in the [respondents'] home and having problems as a result. It is stressful for the juveniles to be in foster care.
163. [J.R.] has difficulty trusting people and is concerned about being safe or hurt by caretakers or parents.
164. [I.R.] has angry outburst[s] and academic difficulties.
165. The juveniles need a home where they can feel safe, secure, loved, protected and have permanency.
166. It is very important the juveniles feel believed, especially as victims of sexual abuse. There is a risk of depression, repeated negative choices and self confidence issues when not believed, especially by parents. Without being believed by [a] parent, it is difficult for victims of sex abuse to have a meaningful relationship with [a] parent.
167. These children need to be able to trust their primary caretakers and if they cannot trust their primary caretakers, there is a risk that it will make it difficult for them to trust anyone.
168. The [respondents] never meet with Ms. Ragland to discuss safety issues and what would need to happen for the juveniles to be reunited with the [respondents].
. . . .
170. It is not in the children's best interest to have any contact with [A.F.].
171. These juveniles are capable of bonding with new parent[] figures.
The court concluded, based upon all of its findings, that termination of respondents' parental rights is in the best interests of the children.
We hold that the trial court properly considered the factors listed in section 7B-1110(a), including the catchall "[a]ny relevant consideration," as it was required to do. The findings show that the children have issues of trust and safety being in respondents' home, respondents have not acknowledged that any wrongdoing occurred or that the children were abused, and the children have problems as a result of the mistreatment they endured. The findings also show that the children are capable of bonding with parental figures and that they need a safe home where they can feel protected. Such a home does not seem possible with respondents.
Further, we are not persuaded by respondent-father's arguments that the court did not consider the likelihood of adoption of these children or that, because evidence was presented that the children remain bonded with him, the court abused its discretion in making its best interests determination. The findings here are not so deficient as to support a conclusion that the trial court's determination was "manifestly unsupported by reason." Therefore, we do not hold the trial court abused its discretion in determining that the best interests of the children are served by terminating respondent's parental rights. Respondents' assignments of error on this issue are therefore overruled.
Affirmed.
Judges McGEE and CALABRIA concur.
Report per Rule 30(e).